Good morning. May it please the Court, Andrea Lisi on behalf of the City of Los Angeles, Petitioner in this matter. I'd like to reserve three minutes for rebuttal time and address primarily two main issues before the Court today. First, the noise analysis and the environmental impact statement, and relatedly the lack of cumulative noise analysis, as well as the alternatives. Addressing the first prong on the Court's decision tree, the standing issue that respondents have raised. The City, in our reply, I think addresses those concerns. The City has alleged standing in the First Amendment petition. We did not submit a declaration. However, that's not required under Sierra Club v. EPA when the facts of the matter reflect that an agency does have standing under NEPA, and specifically with respect to the land use discretion that the City has to enforce its own general plan land use standards in terms of noise, public health, and safety. Again, that's the question I had. The City is saying that it conflicts with the City's noise ordinance. How would that create an injury? So the City's noise ordinance contemplates 60 to 65 DBA for residential uses being on the upper end. So to the extent that the EIS here did not include, for example, haul trips going up and down San Fernando Road within the City of LA's jurisdiction to get to I-5, for example, that is a direct harm to the City in terms of its streets. The respondents up there. Yeah, but what's this harm to the City, that there's too much noise in the City? It seems like it's the residents that would be harmed by that. Well, it is. I mean, so admittedly, the residential interests are aligned with the City's interests. However, the City does have an interest in enforcing its own land use standards. So that's the City of Sausalito case, where we had the Fort Baker project, where there was increase in traffic, increase in noise. I think it's mostly because of the tax base or the road congestion issues that you put. Right. So I just wanted to clarify, too, for the record, since it wasn't in our reply, that in the first amended petition, the City, we did allege that there was inconsistency with the noise standards at Paragraph 52, that there was also cumulative noise and economic social impacts at Paragraph 45, and also property taxes could be influenced and reduced at Paragraphs 59 and 60. So addressing the noise analysis, which is a primary concern. So we have here a very highly impacted area. The City already has a lot of residents living within the 60 to 70 dBA contours due to the aircraft noise, but also traffic noise, as FAA has recognized in its opposition. So we have a project that's coming forward that's going to be four to six years of construction. There's up to 690 one-way truck trips on various streets that haven't been identified yet at various times throughout the construction, and over 260,000 cubic yards of combined asphalt and concrete and other debris that need to be removed from the site in order to build the passenger terminal replacement. But there's no analysis in the EIS of these direct construction noise impacts. The FAA points to the Federal Highway Association or authorities table that generally lists pieces of construction equipment that could be used and what their maximum noise levels are. But the FAA did analyze the construction noise, and it said that because the closest neighborhoods are in this high noise area, in the 70 dBA area, and because of the distance from the airport, that it would have no impact. What's wrong with that analysis? Well, it actually said that there would be with attenuation up to 70 dBA at the closest sensitive receptor, which is 930 feet away just over San Fernando Road. So the harm there is that there was no real either detailed analysis or quantified noise analysis in the EIS. It's a generic kind of point to the table of the equipment that might be used in isolation, mind you, not with multiple pieces of equipment. That typically is used in a big construction project such as this. So they didn't get down into, you know, really analyzing what are those impacts to sensitive receptors. It's just a very... I mean, it seems like they did analyze it. You just disagree with them at that analysis. Well, respectfully, Your Honor, no, I don't think they analyzed it. There's just a table in the EIS that, you know, weighs out the various pieces of equipment, but there's no actual noise modeling. There's no real detailed discussion of that. And, actually, the FAA is right there for desperately on that thing. But right there is, you're going to put your finger on one of my problems because I'm trying to figure out where the 70 decibel number comes from. And when I say that for the benefit of all concerned here, I'm not so sure if that's a threshold. Should I view it as a threshold as opposed to a measure of ambient noise that's, you know, going to be experienced? And then, you know, if it's a threshold, where does that come from when we decide that that's a minimal impact? Because I think that I understand where the 65 decibel comes from, that the corridors we're talking about are already experiencing that. So I'm going to ask several things there. First of all, I think we're looking to the federal highway methodology because FAA didn't have one. But is that where the 70 decibels comes from? My understanding of the FAA in looking at the rod, and this is at 1P or 63, is that looking at an individual piece of equipment such as a jackhammer at the closest sensitive receptor would be 70. So I think it's the latter, Your Honor. I'm trying to figure out whether there's going to be a difference in your concern. We have talked about cumulative impacts in a minute, but I'm trying to figure out where 70 comes from. Should I think of that, do you think of that as a threshold? No, I think of that as how the FAA has considered where the maximum noise would be at the nearest sensitive receptor versus the threshold, which they said there is no threshold for construction noise, which is. . . So that's my other problem. So if that's true, we don't have a threshold for construction noise. They certainly didn't. They were upfront about that, but they didn't. I think the question was whether they imported or borrowed one. But if there isn't a threshold, how do we know? I'm trying to figure out how we decide. There's a reason analysis for the fact that any impact would be minimal. Right. So that was the city's concern, that there needs to be some threshold, some analysis, and there isn't any. The desk book references a 65 dB threshold with any increase in 1.5 being a significant impact, primarily for aircraft noise. There's also reference in the desk book to doing a quantified noise analysis of construction noise for wildlife impacts, potentially for various projects. So there's no reason why that can't be done for human impacts as well. There was never any explanation in the EIS as to why there can't be some more. . . I thought the 7 dB was what the noise was. The ambient noise is in the nearest neighborhood. And so if it doesn't exceed that 7 dB, then it's not going to make any impact. Is that correct? Well, I believe that's correct with what the FAA concluded, that it would be 7 dB. But it was only taking into account one piece of a construction equipment potentially being used at a time. So that's your disagreement with the actual analysis? Correct. So that's the concern. I thought you had multiple points of disagreement. Am I wrong that using the LMAX, they concluded that a single event, the jackhammer, an impact piece of equipment, would reach 930 feet, this residence, at a level of 64, just below the desk book reference saying 65 is the minimum significant threshold. Hence, no impact. Isn't that how their analysis went? I believe their analysis, they found that construction noise would attenuate to less than 70 dB, at a sensitive receptor closest to the northeast quadrant. Attenuation is caused by diffusion because distance or because of the freeway, Interstate 5, or ambiguity? Personally, Your Honor, there really wasn't any discussion about that, other than this is the assumption that Federal Highway Authority uses. So one critique is just they had to explain somehow this diffusion abatement process. Correct. But a secondary critique of yours, I thought, was that this isn't going to be a project over four years with just one jackhammer. Correct. And also there's going to be haul trips that are occurring that were not considered at all. But they do describe that there will be heavy construction equipment, not just impact equipment. Correct. So there's creating jackhammers. There's no effort to show how decibel levels add to one another. Right. Correct. And there is evidence in the record showing where if you have two noisy uses, 60 dB and 60 dB in the desk book, then you should assume that there would be a 3 dB increase. As you're understanding then, of course, highway and airport construction projects occur all over the place. And therefore, there are settled and established methods to decibel add. It isn't just addition. It's logarithmic. Correct, Your Honor. So in my experience, it's very rare for an analysis such as this just to stop at, here's a generic table of construction equipment, and that's it. And here's the generic assumptions. Usually there's more analysis and disclosure about exactly where the sensitive receptors are. Who raised that issue to the FAA? We did. We did. This is in our comment letter. In the opening brief. Is there a specific allegation that they should have aggregated to construction equipment to reach a different decibel level? I believe that's in our opening brief at pages 40 and 41. But you have to raise it below. Well, we're here on original jurisdiction. Don't you have to raise it to the agency? Yes, we did. Sorry, where did you raise it to the agency? Because that's a very specific allegation. I feel like we're going to reverse on that ground. That should have been presented to them. Well, we raised it at 1PER, I think. 1PER. Where we're talking about the, excuse me, Your Honor. Maybe I can get that to you while opposing counsel's. To me, that's an important point. Right. I know it was in our comment letter. I'm just not quite sure of the exact site. You're not going to press the Measure B argument? Well, yes, Your Honor. So, I mean, moving to that. I just also wanted to highlight that under the cumulative noise analysis, you know, there is none. The FAA looked at just the increase in operations that would occur just from aircraft over time, but not the cumulative construction plus aircraft. So that's another. I think you wanted to raise there some time. I just had a question about Measure B. Oh, yes, of course. If you think it's fully presented in a brief and you want to reserve your time, that's fine. Okay.  It's because there was such a history of disagreement between the city and the authority in this Measure B that the city passed giving the voters an opportunity to weigh in, that only the proposed project could have been the preferred alternative. And this is where there were at least four alternatives that were screened out based on the Step 2 of the screening process, which, you know, were found by the FAA to meet the purpose and need, but not necessarily to meet Measure B. But that analysis is not clear, like why these other alternatives were rejected. And, you know, was it because of Measure B or other reasons? And respondents attempted to distinguish that concern based on the other reasons, but it was never described in the EIS. Yes, I would like to reserve. Thank you for your argument. Good morning. I'd like to support Justin Heminger for the Federal Aviation Administration. With me here at council table is Joseph Manalili from the Office of General Counsel at FAA. I will take ten minutes or so, and counsel for the airport authority will take the balance of time. So there are two basic points that we'd like to make here today. One is that we have raised standing and questioned the city's standing. I don't plan to address that because I think our brief has addressed that, and the city has addressed that in their reply, and I listened to the question. If we have questions, we'll jump right in. Yes. And then the second point is on the court's questions today about the noise analysis, and I'm happy to also talk about alternatives if the court has any questions. So on the noise analysis, to go to Judge Boumediene's question about whether the city raised this issue of combining certain pieces of equipment, I believe the site's and the city's comments are at excerpts 435 to 436. So that is where the city discusses the table that the FAA prepared analyzing noise impacts. To Judge Boumediene's question, I don't read in reading these comments, I don't see the city to have specifically raised this very technical issue of combining certain pieces of noise equipment. They did raise several issues, one of them being that the list of equipment that FAA was analyzing was incomplete. And so the FAA did respond to that comment and included a jackhammer as the noisiest of all construction equipment in the final EIS, in the revised table analyzing the construction noise. So the FAA did respond to the comments that it received from the city, but I don't read these comments as raising these specific technical issues that the city is now raising before this court. So the first time you've heard that argument that you should have combined construction equipment was in the opening brief? That's correct, Your Honor. But if the city and the residents are saying, this is going to cause us too much noise for four years, and then there's focus on all the equipment, heavy construction equipment and impact equipment, how is it in the response from the FAA is, well, let's pick the jackhammer. Because that will, I guess, diffuse or dissipate down to 64 decibels by the nearest house. That's the way that the FAA did the analysis, yes, Your Honor. Okay. Is there any modeling at all anywhere, noise modeling as to aggregating construction equipment? No, Your Honor. The FAA didn't. Are you talking about aggregating the construction noise or noise from the airport's operations? I guess my decision tree on this would have, I would have assumed you would do rules of decibel addition to assess how much noise that person in that house will have. You wouldn't just say, well, there's just going to be one jackhammer for four years. How is that possibly not arbitrary and capricious to say, don't worry, it's 64 because it's one jackhammer? So the FAA was modeling the most, was doing a conservative analysis of noise. So the FAA is taking the loudest piece of equipment that may be used at some point during the construction process and then benchmarking that against using the Federal Highway Administration's data and then benchmarking that against the closest noise-sensitive use, which is a resident's home. Again, as Nate was just talking about, why would the FAA want to use this LMAX sound descriptor? Because it is for a single noise event, correct? It doesn't. There are other measures like CNEL or DNL that look at combined. What relevance would it be for people who live there that there will be one sort of lightning bolt, thunderclap, one car passing, which is what LMAX is used for, as opposed to four years of an immense billion-dollar construction site? So LMAX doesn't measure, I'm not going to do it justice, but LMAX doesn't measure a single moment of sound. It is measuring sound over time. I think it's, by its definition, a single level for a single noise event that does not contemplate numerous events or duration of time. Am I wrong? I wouldn't disagree with Your Honor. Is that from the excerpts? Well, that's what LMAX and DNL and CNL are differentiated as. But, okay, explain to me the rationale. That's what we're looking at. What was the rationale behind just picking one piece of equipment? Doesn't that pretend that nothing else will be used as you would aggregate the noise? Well, noise, so it's certainly the case that noise dissipates over distance. And so when FAA is doing its benchmark, when it's modeling, it's looking at the loudest noise and seeing whether that loudest noise will reach the closest residential property. And I think if you look at the excerpts of record at 491, there's a map, and we included this in our brief as well, showing where the closest residence is. So FAA is modeling whether the noise from a jackhammer will reach that residence at a level that is above 64. Do you understand my question? I do. Let's say you have blasting going on at the same time as you have pile driving going on at the same time as you have a jackhammer. That would far exceed the 64 maximum level that the FAA stopped its analysis at in order to say there's no significant impact. How could it not? So this analysis is conservative because FAA was saying, look, here's the distance. It's two and a half football fields from the construction site to the closest residence. And if you're just looking at the modeling from the data from the Federal Highway Administration, that's showing it's going to dissipate to 64 decibels. But, in fact, this is in an industrial area, this project. This is on the airport's property. It's in an industrial area. So you have buildings, you have commercial activities, you have San Fernando Boulevard, and then you have residences. And so FAA said, well, 64 is the loudest that a jackhammer could be, but there are all these ways in which we expect that the noise will, in fact, be less than that. Because by the time it's... I'm a conservative counselor. Forgive me for interrupting. Sure. I appreciate that it's not our job to pick a methodology, but you have to show your work, right? Right. And so I think going to the – I know you have a problem with going to the Highway Administration, but my understanding is your own desk – the FAA's own desk book when we're talking about airport operation noise is contemplated. I think it's an example about what to do when you have sound coming from more than one source. So that isn't carried over into whatever, right, in the table that we've got that we've all been looking at that's got jackhammers and a bunch of other individual sources. I think I have some of the same problem that my colleague is expressing. Well, I think there is... We're going to have to look at one at a time. So FAA could have aggregated noise. I would go to Judge Bruinfeld's point that Los Angeles didn't raise this. So Los Angeles submitted roughly many, many pages of comments covering roughly 30 to 60 topics, and FAA did their best to engage with those and to respond to those technical comments. I don't think you'll find this particular technical comment among them. When FAA is doing its analysis of noise from operations, planes, airport, planes, that's the core of FAA's analysis. I did not read that. There's examples where the desk manual does anticipate sound coming from more than one source. The desk reference, of course, is non-binding. It's just guidance. But what it says is if it's non-airplane noise, that FAA is going to do that sort of analysis on a case-by-case basis as appropriate, and it refers to, among other things, the Federal Highway Administration's model, or it says go look at things like modeling from the Federal Highway Administration. There's not a lot of guidance in the desk. Does the FAA ask you to aggregate construction noise? I'm not aware that it does. We've submitted in supplemental excerpts some portions from that. Has FAA ever done this type of aggregation of construction noise in any other project? I can't say one way or the other, Your Honor. This is no, and, you know, FAA is not in the business of building things. They're in the business of making sure planes fly safely. So this is not within, you know, what they do for every project. But they applied the expertise they had. They used the modeling and the data from the Federal Highway Administration. They did the best they can. Could I ask a somewhat related question? I want to make sure I ask what we have time to on this a little bit. At the record of decision 239, it tells us that the noise associated with the project is anticipated to be minimal and would not be a significant impact. I'm focusing on the word minimal there. Yes, Your Honor. I think the reason you didn't do a cumulative impacts analysis is because you decided that individually, right, nothing rose to the bar. But that's the problem I've got. We have case law that says there's no effect or essentially no effect, doesn't require a cumulative impacts analysis. But Kern versus U.S. Department of Land Management says to the contrary that cumulatively significant impacts can result from individually minor but collectively significant action. And you're, for some reason, using the word minimal. Where does that come from? Let me just say, I don't think it's just for our case law. I'm the only, to not hide the ball here, the only place I can see that we've used that is an unpublished decision that says just the contrary, that minimal can be enough. So I'm not sure what to make of this. Well, I don't think that the FAA was using that in either a technical or a legal manner. I think they're just trying to describe that in common terms, that the noise from this project will be minimal. As to noise density. When we talk about cumulative analysis, though, I appreciate it can matter. That's correct. It does fail to my earlier problem of looking at the equipment one by one. I won't leave time for the airport's authority. They're going to get more time. What's your best shot on this? Because I'm very troubled by this now. Yes, me too. So on cumulative here, FAA was looking at two things. They were looking at noise from the operations at the airport and they were looking at noise from the construction. And when they're doing their cumulative analysis, those are the two things that they're looking at. They're comparing those two things. The noise from the operations will not change from this project. Los Angeles does not contest that. That's not an issue here. So airplane noise won't change. The only question is when you take airplane noise and you add it to construction noise, is that going to be some sort of cumulatively greater noise than 65? We understand that question. I think that's well briefed. So I guess one way to answer that question, I would point the court to the noise contour map. So the noise contours, and I'll have to find the site for that, but the noise contours for airplane operations track the runways. So noise is noisiest on the runways. The runways actually go north, south, and east, west. This project is going to be in the northeast quadrant, and then the closest residences are, in fact, further away across the street. So what FAA is saying is the only noise, the only cumulative noise at issue here, is from the construction project. This is the impact to residences outside of the noise contour, the 65 dB noise contour for the airport. There's also a list. Sure, but why didn't the FAA not conduct a cumulative noise impact based on construction noise? They could have done. I would say they could have done more on that, but what they were looking at is the construction noise is not going to be significant. They had determined that it's going to be minimal. That's the whole point of the cumulative impact analysis, that it might not be significant by itself, but if you combine it with others, it could be significant. That's the disconnect I'm getting from it. Right. I think if you look at the list of projects that FAA identified for purposes of its cumulative impacts analysis, and then you line that up, and when doing that list, FAA consulted with Los Angeles to see what other projects were going on. If you take that list of projects, and then you compare that to the construction project here, and then you combine that with the noise contours, I think what FAA was saying, and they could have spelled it out in more detail, but I think what they're saying is there's just not going to be a cumulative impact. There's no noise to add to. That's because I think at the Record of Decision, page 239, I think that's because it's a sentence, and I mean it's one sentence. The noise associated with the project is anticipated to be minimal. It would not be significant, so it's a conclusion. And I'm trying to figure out where the... So that's the conclusion on noise under cumulative impacts. If you look at 248 to 256, that's the cumulative analysis. And the sentence that FAA, where FAA addresses this, is in the second paragraph of cumulative impacts on 248. And it says resource categories that would not result in potential adverse effects as a result of the proposed project cannot result in cumulative impacts. I think we appreciate all that. Yeah, and State Farm, if the agency's path can reasonably be discerned, then on a highly technical issue like this, FAA gets deference. FAA was saying there aren't going to be adverse impacts from noise caused by this construction project, and so we don't need to go further than that in a cumulative impacts analysis. Well, that's why one rolls into the other, right? That's correct, yes. Yes. So the loudest individual source you've got from the, these are my words, but from the construction project is a jackhammer, and that's why we started there, Mark. That's correct. Thank you. If there are no questions about the alternatives analysis, thank you very much. You bet. Madam Clerk, would you put three more minutes on the clock? We took up a lot of this lawyer's time. He's prepared carefully and would like our attention, so go right ahead. May it please the Court, my name is Tom Ryan. I have the pleasure of representing the intervener for Bank Lindale-Pasadena Airport Authority. It owns and operates the airport at issue here. It's the sponsor of this safety project. If you want me to talk about noise, I will at the end, but I'm going to take a little bit of a different approach. I remember driving here today as I came here, not because I've been in 9th Circuit before, but because I was in this courtroom when this case was last before this court, albeit a different panel, and that was the seat of Los Angeles filing a petition challenging the FAA's EIS for a placement passenger terminal. And different panel, we prevailed that day. And it's a legitimate question to say, why are you back here, Tom? We don't wish you here. You won once, go away. You're welcome. But why are you back here? We're back here because that project was never built. That project, even though it was intended for the exact same site of this project, which, if you're a student of history, is the Skunk Works, where Lockheed built Stealth. That's the history of the airport. The project was always intended to go there for a very simple reason. The current terminal is too close to the runways, plus planes take off to the south, they land from the west. Right now, some planes have to cross an active runway. There's only one section of the airport that you can put a terminal, and planes backing up or coming in don't have to cross an operating runway to either take off or land. That's why it's the preferred alternative. So then the question is, well, why didn't you build it? Because what we were trying to build back then had twice as many gates and three times as many parking places and four times the size of the terminal. And the local community lost its money. And we went through years of litigation. And at the end of the litigation, there was a political compromise. Same number of parking positions for the cars, same number of parking positions for the planes, and you can build it up here. We did a CEQA analysis. CEQA is normally considered a higher standard than NEPA in this state. Nobody challenged. Nobody, including the people in this room. So you ask yourself, why are we back here? I would submit that we're a hostage. About two or three years ago, planes started to drift in the southwest part of the country to slightly different flight types. Some people believe it's weather. Some people believe it's because the FAA has a Metroplex project that is adjusting flight patterns with certain wave point turns. In their opening brief, page 53, they make clear the SLAC or ZOE wave points are driving them crazy. They put hundreds of thousands of complaints in about aircraft noise. That's a legitimate concern, but it has nothing to do with this project. This project doesn't change the runways, doesn't change any flight procedures. There are three active lawsuits between L.A. and the FAA about flight paths. This is 3.1. We didn't notice it as a related case because they're smart enough not to do it in a way that's a collateral attack on other things currently before the Ninth Circuit, but this is all part and parcel of one fight. Sorry? Yes, on your noise. Are you interested in a layman's approach to what was theoretically going on here? The 65C now contour, which is what's used for aircraft noise. You're right, it's an algorithm, but it's a weighted algorithm. You get one point for during daytime hours, three for evenings, ten for at night. Where the contours are around the runways and where the new terminal is going to be, there's no way that 65 contour moves out 1.5, no matter how many TAC cameras you're using during daylight hours. As long as construction's not at night, that contour's not moving. The FAA was attempting to actually be overly conservative and go to a single event. You just don't add noise of 1.1.1. It's an algorithm, and it's weighted for night, and that wasn't going to move that contour. So I understand the point that construction noise would be drowned out by the normal operation of the airport, so it's not quite this full adding on. Is that the argument? I will never tell a judge his argument is not right, but I would twist it and say another way of looking at it, the measurement for significance is 65 contour, or movement into it, or move up inside at 1.5 dB. There's no way single events, no matter if you jackhammer all day, is going to ever get to a 65 CMEL, as opposed to a 65 single event. You are trying to add apples to oranges. They don't add. You can't get there from here. Thank you for your argument. And I apologize for the, I apologize for me. I apologize. You don't owe us an apology. Your argument's well received. Thank you. We'll hear rebuttal. Thank you, Your Honors. So to get back to your question, Your Honor, and in addition to what Mr. Heminger had added, there was a technical expert comment letter that we submitted on behalf of the city, and that is to PER 464 and 465 by Environmental Compliance Solutions, where we did generally raise, you know, the issue of needing to look at all construction equipment that was identified in the air quality analyses and should be combined and assessed with the existing airport operations. So it was a more general comment, not the 60 plus 60 that we're pointing out in the desk book that is an example of, you know, the assumptions that can be made when you do a noise analysis. So I just want to clarify that point. So with respect to this cumulatively significant individually minor impacts issue, the CEQ guidelines at Section 1508.27 also provide additional guidance on this in an agency having to look at context and intensity, and that just because an impact could be less than significant doesn't mean it's not potentially cumulatively considerable. So you can't dismiss it just by labeling it as temporary and interwritten like construction noise has been labeled in this document. So I just wanted to point the panel out to that as well. And while I empathize and I've not been part of the prior assorted history here previously, it just begs the question that, you know, noise has been an issue of concern for residents and people in this area, the city of Burbank, residents, LA, concerned as well. So it's not really a highly technical issue, and it begs the question, why wasn't this analysis included in the EIS, and why was there no cumulative noise analyses? There should have been given all the past history and what, you know, NEPA requires. And also just one last point that, you know, this really isn't necessarily the same project that was previously considered. We are talking about an increase in the terminal building size, so it's not exactly the same project. With that, we'd just like to submit and request that the court require the FAA to go back and revisit its EIS analysis, unless you have any further questions. It doesn't appear that we do. Thank you for your argument. Thank you all for your argument. We'll stand and recess. Thank you. All rise. Hear ye, hear ye. All persons having had business with the honor roll of the United States Court of Appeals for the Ninth Circuit will now depart for this session. Stand adjourned.
judges: Higginson, CHRISTEN, BUMATAY